**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **CRIMINAL ACTION FILE NO.** |
| | **:** | **1:10-CR-519-AT/AJB** |
| **MOSES DAMIANI (#1),** | **:** | |
| **JUSTIN SAULTERS (#3),** | **:** | **(First Superseding)** |
| **DAMON J. SAULTERS (#4),** | **:** | |
| **WADDELL WHITE (#5),** | **:** | |
| **TODD MILTON IVERY (#6), and** | **:** | |
| **WILLIE WILSON (#7)** | **:** | |
| | **:** | |
| **Defendants.** | **:** | |

**ORDER FOR SERVICE OF**
**REPORT AND RECOMMENDATION**

Attached is the Report and Recommendation ("R&R") of the United States

Magistrate Judge made in accordance with 28 U.S.C. § 636(b)(1) and

N.D. Ga. CrR. 58.1(A)(3)(a), (b).  Let the same be field and a copy of the R&R,

together with a copy of this Order, shall be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections to the

R&R within **fourteen (14)** days of service of this Order.  Should objections be filed,

they shall specify with particularity the alleged error(s) made (including reference by

page number to the transcript if applicable) and shall be served upon the opposing

party.  *See United States v. Gaddy*, 894 F.2d 1307, 1315 (11th Cir. 1990).  The party

filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the District Court.  Failure to object in accordance with this rule waives a party's right to review.  FED. R. CRIM. P. 59(b)(2).

Pursuant to 18 U.S.C. § 3161(h)(1)(H), **the above-referenced fourteen (14) days allowed for filing objections is EXCLUDED from the computation of time under the Speedy Trial Act ("the Act"), whether or not objections are actually filed.**  If objections to this R&R are filed, the Clerk is **DIRECTED** to **EXCLUDE** from the computation of time all time between the filing of the R&R and the submission of the R&R, along with any objections, responses and replies thereto, to the District Judge.  18 U.S.C. § 3161(h)(1)(D), (H); *Henderson v. United States*, 476 U.S. 321, 331 (1986);  *United States v. Mers*, 701 F.2d 1321, 1337 (11th Cir. 1983).  The Clerk is **DIRECTED** to submit the R&R with objections, if any, to the District Court after expiration of the above time period.

**IT IS SO ORDERED and DIRECTED**, this  23rd   day of   September   , 2011.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL ACTION FILE NO.** |
| | : | **1:10-CR-519-01-AT/AJB** |
| **MOSES DAMIANI (#1),** | : | |
| **JUSTIN SAULTERS (#3),** | : | |
| **DAMON J. SAULTERS (#4),** | : | |
| **WADDELL WHITE (#5),** | : | |
| **TODD MILTON IVERY (#6), and** | : | |
| **WILLIE WILSON (#7)** | : | |
| | : | |
| **Defendants.** | : | |

## UNITED STATES MAGISTRATE JUDGE'S
## FINAL REPORT AND RECOMMENDATION

Pending before the Court are the pretrial motions filed by the above named Defendants. The Court resolves them as follows:

## I.   *Moses Damiani's Motion to Suppress Statements, [Doc. 51]*

Moses Damiani has filed a motion to suppress statements, [Doc. 51], seeking to suppress statements he made to FBI agents on January 28, 2008. The Court held an evidentiary hearing on the motion on June 10, 2011. [Doc. 137 (hereinafter "T__")]. Defendant filed a post-evidentiary hearing brief, [Doc. 141], and the government responded, [Doc. 148]. Defendant did not file a reply brief. [*See* Dkt.].

AO 72A
(Rev.8/8
2)

*A.    Facts*

On January 29, 2008, at approximately 4:30 pm, agents of the Federal Bureau of Investigation, according to a prearranged operations plan,  interrupted a real estate closing occurring at a law firm conference room in the Candler Building in Atlanta, and arrested Shawn Dominique and Milton Wayne Hunter.  T16-17, 25, 41.  Pursuant to that operations plan, the FBI also sought to identify other participants at the closing and interview them.  T17.

The operation involved 12 armed FBI agents wearing body armor with their badges displayed either on their waistbands or around their necks.  T18, 20.  Not all of the agents went into the conference room where the closing was taking place, but those that did verbally announced as they entered that they were FBI agents.  T21.  There were five to six persons in the conference room (including Defendant Damiani), and approximately 15 to 20 other persons in the law office.  T22, 24, 25, 27.  The persons in the closing and the others in the law offices were directed into an open area outside the conference room.  T34.  The FBI advised them that the closing was being investigated and that a couple of persons were to be arrested.  T22, 25-26.

Dominique and Hunter were handcuffed and arrested.  T23, 26, 28.  They also were patted down for weapons.  T27.  Dominique and Hunter were asked about the

2

presence of personal belongings or luggage in the room so they would not be left behind. T26. One of them acknowledged that he had such items and they were taken with the arrestees and agents when Dominique and Hunter were removed from the law office. T26. No other person present was searched or patted down. T28.

One of the agents then announced that they would ask everyone else to identify themselves and that the FBI wanted to interview some of them. T28.[1] Damiani was one of the persons in the closing in the conference room. T24, 33. An FBI agent asked who was Mr. Damiani and Defendant identified himself. T42. He was told that the FBI would like to talk to him in another room so they could have "a little bit of privacy." T42, 55. The agents knew he had traveled from New York for the closing. T24. They did not ask if he had any luggage or personal belongings in the conference room. T54.

Interviews were conducted in offices down the hall from the conference room. T30. Agents Cromer and Ross asked Defendant to step with them to the room next to the conference room. T42. They did not search or pat him down and did not touch him. T43. The room was 15 feet by 10 feet and contained a table in the middle and chairs. Windows overlooked the city and the wall to the hallway either had windows

---

[1]       A total of five persons were interviewed. T31.

3

or a glass door to the hallway.  Damiani was seated closest to the door with his back to the hallway, and the agents occupied two other sides of the table.  T44, 54.

Cromer and Ross introduced themselves to Damiani and showed him their credentials.  T44.  They advised him he was not under arrest.  T44.  They advised him they wanted to ask him a few questions about the closing and how he got involved in it, T44, but only Cromer asked questions. T56.  Damiani explained how he got involved and that he had his father-in-law's power of attorney to purchase the properties.  The agents also went through the settlement statement and other documents with Damiani.  T44, 47, 48-49; *see also* Govt. Exhs. 3, 5A-5D.[2]  The agents did not go over with Damiani those documents he stated he had not seen before, but asked him detailed questions about those he stated he had seen or signed.  T52.  For example, Damiani acknowledged he signed the loan application, so he was asked to confirm that his father-in-law earned $27,500 per month, which he denied.  T52; Gov't Exh. 3 at 3.  He also stated that he did not believe that Wolf's employer or certain account balances of his father-in-law listed on the application were correct.  T52-53; Gov't Exh. 3 at 3.

_____

[2]    While interviewing Damiani, the agents called Damiani's father-in-law, Henry Wolf, who confirmed that Damiani in fact had his power of attorney for a closing in Atlanta.  T47.  At the time the agents initially entered to interrupt the closing, they were not aware that Wolf was Damiani's father-in-law.  T50-51.

AO 72A
(Rev.8/8
2)

Cromer did not indicate to Damiani that this was a fraud investigation or that further arrests would be made; rather he explained that there might be further questions in the future.  T53.  Damiani was not asked to retrieve any documents for the agents, nor did the agents take any documents from him.  T56.  They also did not ask him for identification because the agents already had seen Damiani's driver's license photograph in preparation for executing the operational plan.  T56.

Agent Ross described the atmosphere of the interview as relaxed and cordial.  He stated that Damiani was very cooperative, and that no one raised their voces or screamed.  T48.  Damiani was not handcuffed at any time.  T48.

While Cromer and Ross interviewed Damiani, FBI Special Agent Stites came in and was introduced to Damiani as the case agent.  Agent Kolana also came into the room to determine the progress of the interview.  Neither Stites not Kolana asked Damiani any questions.  T56.[3]

---

[3]     Cromer testified that Kolana asked him how the interview was going and whether Damiani's answers were truthful.  Cromer responded that they were.  T56.

5

Damiani's interview lasted about one hour.  T24, 44.[4]  At the conclusion of the interview, the agents let him know that they did not have any further questions, that they had his contact information, that Agent Stites was the case agent and might call him with additional questions, and if his telephone number changed, to contact them so that they could stay in touch.  T44-45.  They then told him he was free to leave. T45.

B.      *Contentions of the Parties*

Damiani contends that he was in custody during the questioning by Cromer and Ross, and thus was entitled to *Miranda* warnings before he was questioned, and therefore any of his un-*Mirandized* statements should not be admitted at his trial.  He argues that the following circumstances demonstrate that a reasonable innocent person would have concluded that he was formally arrested or a restraint on his freedom of movement of the degree associated with a formal arrest: (1) entry into the conference room by armed and armored FBI agents, (2) who immediately handcuffed and arrested two persons participating in the same loan transaction as Damiani, (3) and then

_____

[4]      The time between the FBI's initial entry into the closing until the FBI agents left was 1½ to 2 hours.  T24.

6

subjected him to extensive questioning, (4) about potentially incriminating documents. [Doc. 141 at 5].

The government opposes Damiani's motion on the grounds that he has not established that he was in custody or that the restrictions on his movement were of a degree associated with formal arrest. It points out that (1) the interview took place in the offices of the closing attorney, (2) the FBI agents identified themselves and stated they were going to arrest two individuals and identify others they were going to want to interview, (3) they asked Damiani to accompany them to a room next door to the closing room to be interviewed, (4) they never took him out of the law offices, (5) only two agents spoke to him, (6) they told him he was not under arrest, (7) in the interview room, Damiani sat closet to the door and no agent sat next to him, (8) he was not restrained, (9) the agents did not handcuff, pat down or search him, nor did they touch Damiani, (10) they did not ask him about any luggage, (11) the agents did not ask him for any papers or retain any that he displayed or possessed, (12) the agents told him they wanted to question him about the closing and how he became involved, (13) they showed him documents and asked him questions about those he acknowledged he was aware of, (14) the atmosphere of the interview was cordial, conversational and non-confrontational, (15) although Damiani had traveled from New York, he did so on his

7

own accord and not because the FBI instructed him, (16) there was no indication the agents were going to remove him to another location or the police station.

C.     Applicable Law

The Fifth Amendment of the United States Constitution provides in relevant part that, "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V.  The Supreme Court's decision *Miranda v. Arizona*, 384 U.S. 436 (1966), and its progeny "govern the admissibility of statements made during custodial interrogation in . . . federal courts." *Dickerson v. United States*, 530 U.S. 428, 431 (2000). *Miranda* requires "that certain warnings [ ] be given before a suspect's statement made during custodial interrogation [can] be admitted in evidence." *Id.* at 431-32.  Specifically, law enforcement must fully apprise the suspect prior to the initiation of questioning of (1) the government's intention to use his statements to secure a conviction (2) his rights to remain silent and (3) to "have counsel present . . . if  [he] so desires." *Miranda*, 384 U.S. at 468-70.

These "*Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent."[5] *Rhode Island v.*

---

[5]      "[T]he definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Innis*, 446 U.S. at 301 (emphasis in original).  As a result,

8

*Innis*, 446 U.S. 291, 300-301 (1980); *see also Pennsylvania v. Muniz*, 496 U.S. 582, 600 (1990); *Arizona v. Mauro*, 481 U.S. 520, 526 (1987).  A suspect is only entitled to *Miranda* warnings when he is interrogated while in custody, because such circumstances are presumed to exert pressure on him to speak.  *See Miranda*, 384 U.S. at 444; *United States v. Lall*, 607 F.3d 1277, 1284 (11th Cir. 2010).

The defendant bears the burden of demonstrating that he was in custody.  *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977).  The test for whether a person is in custody is whether the suspect is " 'subjected to restraints comparable to those associated with a formal arrest.' "  *United States v. Acosta*, 363 F.3d 1141, 1149 (11th Cir. 2004) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 441 (1984)).  The "custody" inquiry is an objective one , that is, it is viewed from the perspective of the reasonable innocent person.  *Florida v. Bostick*, 501 U.S. 429, 437-38 (1991); *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996).  Since the test is objective, "the

---

spontaneous and voluntary statements not made in response to any government questioning are not covered, or required to be excluded, by *Miranda*.  *Cannady v. Dugger*, 931 F.2d 752, 754 (11th Cir. 1991); *United States v. Suggs*, 755 F.2d 1538, 1542 (11th Cir. 1985); *United States v. Savell*, 546 F.2d 43, 46 (5th Cir. 1977) (*Miranda* does not cover situations "where the statements were unsolicited, spontaneous and freely made prior to any attempted interrogation"); *United States v. Hicks*, 546 F. Supp. 2d 1378, 1381 (N.D. Ga. 2008) (Thrash, J., adopting R&R of Vineyard, M.J.).  There is no dispute that Damiani was subjected to questioning.

9

actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant."  *Moya*, 74 F.3d at 1119.

In determining whether a person is in custody for purposes of *Miranda*, "[c]ourts must examine 'all of the circumstances surrounding the interrogation' and determine 'how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action.' "  *Lall*, 607 F.3d at 1284 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 663 (2004), and *Stansbury v. California*, 511 U.S. 318, 322 (1994)); *see also United States v. Brown*, 441 F.3d 1330, 1349 (11th Cir. 2006) ("No particular fact in the 'custody' analysis is outcome determinative—we simply weigh the totality of the circumstances.").  In assessing whether under the totality of the circumstances a reasonable innocent person in Damiani's position would have understood his freedom of action to have been curtailed to a degree associated with a formal arrest, the Eleventh Circuit instructs courts to consider, "whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled," *United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006) (citation and quotation marks omitted), as well as the location and length of the detention, *Brown*, 441 F.3d at 1348 (location); *United States v. Medina–Villa*, 567 F.3d 507, 519 (9th Cir. 2009)

10

(duration).  Moreover, the Eleventh Circuit has explained "that although a reasonable person in the defendant's position may feel constrained not to leave the scene of a police encounter at a particular moment—and thus may be deemed to have been 'seized' by law enforcement—he will not necessarily be considered in 'custody' for Fifth Amendment purposes.' " *United States v. Luna-Encinas*, 603 F.3d 876, 881 (11th Cir. 2010) (quoting *Street*, 472 F.3d at 1310).

D.      *Analysis*

In light of the above discussed standards, Damiani has not satisfied his burden to show that he was in custody, and thus he was not entitled to *Miranda* warnings before being questioned, since the circumstances of the questioning did not amount to a restraint on his freedom of action comparable to those associated with a formal arrest. First, the agents did not handcuff, search, pat down or even touch Damiani.  Moreover, although the agents were armed and perhaps wearing protective body armor, there is no evidence that they brandished their weapons at any time while executing their operational plan, and certainly did not do so when interviewing Damiani. *Cf. Moya*, 74 F.3d at 1119 (concluding that defendant was not in custody where "[n]o handcuffs were employed, and no guns were drawn" and citing *United States v. Blackman*, 66 F.3d 1572, 1576–77 & n. 4 (11th Cir. 1995), for the proposition that even

11

handcuffing and holding a suspect at gunpoint would not necessarily constitute custody); *see also United States v. Logan*, 241 F. Supp. 2d 1164, 1177 (D. Kan. 2002) (finding that under totality of circumstances, defendant was not in police custody, noting that "[w]hile the officers may have been wearing bullet-proof vests, they did not draw their weapons, did not handcuff the defendant, and did not otherwise physically restrain him.").

Moreover, the evidence is undisputed that the agents interviewed Damiani in a conversational, non-confrontational manner, the atmosphere was cordial and Damiani was cooperative. *United States v. Oddo*, 133 Fed. Appx. 632, 635 (11th Cir. May 19, 2005) (holding that defendant not in custody in part because encounter was non-confrontational); *United States v. Haffner*, No. 3:09-cr-337-J-34-TEM, 2010 WL 5296920, *8 (M.D. Fla. Aug. 31, 2010) (R&R) (no custody in part because interview was cordial), *adopted* 2010 WL 5296847 (M.D. Fla. Dec. 20, 2007).

In addition, it is significant that at the outset of the interview Damiani was advised that he was not under arrest. T44. *See Brown*, 441 F.3d at 1347 ("Unambiguously advising a defendant that he is free to leave and is not in custody is a powerful factor in the mix, and generally will lead to the conclusion that the defendant is *not* in custody") (emphasis in original).

12

Next, the interview was not lengthy, lasting approximately one hour. *Cf. United States v. Muegge*, 225 F.3d 1267, 1269–71 (11th Cir. 2000) (no custody where defendant was directed by supervisor to speak with investigators at a secure site in an interview room with the door closed, where he was interviewed for approximately two and half hours, and was not formally arrested until eight months later); *see also United States v. McDowell*, 250 F.3d 1354, 1363 (11th Cir. 2001) (holding that "there is no fixed limit to the length of questioning" and finding four hour inquiry at Port Everglades not a custodial interrogation).

Further, although the location of the interview is not dispositive in determining whether the interviewee was in custody, " '[c]ourts are much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home." *Brown*, 441 F.3d at 1348 (quotation marks, citation, and emphasis omitted); *United States v. Lanni*, 951 F.2d 440, 442 (1st Cir. 1991) (stating that a court should consider whether the suspect was questioned in "familiar or at least neutral surroundings" (quotation marks omitted)) (cited with approval in *Brown*, 441 F.3d at 1348); *see also United States v. Blackwell*, 182 Fed. Appx. 812, 815 (10th Cir. May 31, 2006) (finding as a significant factor in no-custody conclusion that defendant voluntarily followed the agents to the second-floor

13

conference room).  Here, the interview occurred in a law office conference room, and Damiani had voluntarily and without coercion form the government traveled to the law offices earlier that day for a real estate closing.

Nor did Damiani at any point ask to leave the premises, or inform the agents that he did not wish to comply with any of their requests.  *See Luca-Encinas*, 603 F.3d at 882; *United States v. Phillips*, 812 F.2d 1355, 1362 (11th Cir. 1987) (concluding that defendant was not in custody because, *inter alia*, he "never requested a lawyer or to terminate the interview").

Additionally, that Damiani was a "focus" or target of the agents' investigation did not require that *Miranda* warnings be given to her prior to the questions being asked.  *See United States v. Manor*, 936 F.2d 1238, 1241 (11th Cir. 1991) ("The Supreme Court has clearly stated that Miranda is not implicated simply because an individual is the subject or target of an investigation.") (citing *Minnesota v. Murphy*, 465 U.S. 420, 431 (1984)).  The Supreme Court has stated that "[e]ven a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest." *Stansbury*, 511 U.S. at 325.

14

The totality of circumstances therefore do not demonstrate any evidence of "extensive restraints" comparable to those associated with a formal arrest. *Brown*, 441 F.3d at 1348. As a result, the Court concludes that Damiani's interview "did not involve the type of 'highly intrusive' coercive atmosphere that may require *Miranda* warnings even before a formal arrest is made. The totality of the circumstances were such that a reasonable person in his position would not have believed that he was utterly at the mercy of the police, away from the protection of any public scrutiny, and had better confess or else. No *Miranda* warnings were required at the time." *Acosta*, 363 F.3d at 1150.

For these reasons, the undersigned **RECOMMENDS** that Damiani's motion to suppress statements, [Doc. 51], be **DENIED**.

## II. *Willie Wilson's Preliminary Motion for Disclosure of Items or Statements Arguably Subject to Suppression and Motion to Suppress, [Doc. 120]*

Willie Wilson seeks to suppress any evidence sized from him and any statements made by him to law enforcement. [Doc. 120]. At the June 13, 2011, pretrial conference, Wilson was given until June 27, 2011, to perfect or supplement his motion, and was advised that failure to do so would result in the Court treating the motion as withdrawn. [*See* Doc. 129]. As of the date of this Order and R&R, Wilson has not

15

perfected his motion or sought additional time to do so.  [*See* Dkt.].  As a result, the motion should be treated as withdrawn.

Even if not treated as withdrawn, the motion is insufficient as a matter of law. "A motion to suppress must in every critical respect be sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that a substantial claim is presented. . . .  A court need not act upon general or conclusory assertions. . . ." *United States v. Cooper*, 203 F.3d 1279, 1284 (11th Cir. 2000) (quoting *United States v. Richardson,* 764 F.2d 1514, 1527 (11th  Cir. 1985) (internal citations omitted)). Wilson's motion is a boilerplate motion which fails to assert facts (as opposed to legal conclusions) which if proven would entitled him to relief.

Accordingly, the undersigned **RECOMMENDS** that Willie Wilson's motion to suppress, [Doc. 120], be **DENIED**.

### III.   *Todd Milton Ivery's Amended Motion to Suppress, [Doc. 133]*[6]

In this motion, Ivery challenges the probable cause to issue two search warrants, issued April 24, 2008, and February 17, 2009, neither of which were attached to the motion.

_____

[6]     Ivery's motion is styled as an "amended" motion but he had not filed a prior motion to suppress in this matter.  He may have been referring to a motion to suppress he filed in a related case, *see* Doc. 115 in No. 1:10-CR-412-4-WSD-ECS.

16

A.      *The Contentions of the Parties*

Ivery contends that the warrants, allowing searches of five Yahoo email accounts, including one associated with him, were completely devoid of probable cause, and as such are not saved by the good faith exception to the exclusionary rule as set out in *United States v. Leon*, 468 U.S. 897 (1984).  [Doc. 133 at 2-3].

The government contends that the warrant applications demonstrated probable cause.  It attached the two search warrants in question to its response.  [Doc. 138].

B.      *Discussion*

1.      *The Search Warrants*

The first search warrant application sought authorization to search Yahoo's records to obtain records and account information for five email accounts: smileygiggstreasure@yahoo.com, smaddison0112@yahoo.com, allbig30@yahoo.com, toddivery@yahoo.com,   and   gr_investmentsatl@yahoo.com.1.   *See*  Warrant No. 1:08-MJ-457-LTW (N.D. Ga. Apr. 24, 2008) [Doc. 138-1].  In the affidavit in support of the application for Warrant No. 1:08-MJ-457-LTW, FBI Special Agent Stites   detailed   a   complex   mortgage   fraud   scheme   involving   three   straw purchasers/borrowers - Shawn Dominique, Milton Wayne Hunter and Henry Wolf - who were to purchase 20 units of a property known as 425 Chappell Road, Atlanta,

17

Georgia.  [Doc. 138-1 at 5].  Part of the scheme involved the use of straw purchasers and inflated appraisals.  [*Id.* at 4].  He related that straw purchasers have no interest in purchasing the properties, but are being paid for the use of their identities.  [*Id.*].  The inflated appraisals involved inflated comparables and bogus liens on the property to hide the fact that the appraisals were inflated.  [*Id.*].

The affiant also related information received from John Ellison, a local mortgage broker, Rosemary Canales, a fraud investigator for the lender, Wells Fargo Bank, and reviewed Wells Fargo Bank records and Home Tech Mortgage records.  [*Id.* at 3].  The information from these sources disclosed that in January 2008, Scott Addison, the owner of 425 Chappell Road, a multi residential unit complex, had sales contracts to sell 20 units of Chappell Road to Shawn Dominique, Milton Hunter and Henry Wolf for approximately $300,000 each or a total of about $6,000,000.  [*Id.* at 5].  Ellison advised Agent Stites that he had been contacted by Waddell White who identified himself as a broker and who provided him with the initial personal identifying information for Dominique, Hunter and Wolf - names, social security numbers, dates of birth, addresses.  [*Id.*].  Ellison also provided Stites with copies of the loan applications and supporting documents for the Dominique, Hunter and Wolf

18

transactions that had been submitted to Ellison and Wells Fargo Bank, and the income and the employers listed in the loan applications were false.  [*Id.* at 5-8].  Stites also determined that the brokerage account assets listed in the loan applications for Dominique, Hunter and Wolf did not exist.  [*Id.*].

Stites also determined that in Wolf's loan application, one of the supporting documents was a Verification of Deposit [VOD] of a money market account of $902,675.57 by Willie Wilson of Conceptual Consultants.  [*Id.* at 7].  Wilson was one of the bogus lien holders for 425 Chappell Road.  During the closings which were to be held on January 29, 2008, the closing attorney provided John Ellison with title search documentation listing liens recorded on July 27, 2007, on the units by WT&G Property Management, Inc. - one of Willie Wilson's companies, and B.I.G. Holdings, LLC - a company owned by Derrick Harris.  [*Id.* at 4-5, 8]. Agent Stites determined the liens were actually released on December 28,2007.  [*Id.* at 8].  When asked about the liens, the seller, Scott Addison, told John Ellison that the liens would be placed back on the properties before closing.  [*Id.*].

The affidavit further provided that on January 29,2008, FBI agents went to the closings at the attorney's office in Atlanta, Georgia and interrupted them. [*Id.* at 9]. Dominique and Hunter were arrested.  [*Id.*].  During post-arrest interviews, Dominique

19

and Hunter admitted to the agents that they were being paid for the use of their names to purchase the Chappell Road properties. [*Id.*] Both Dominique and Hunter told the agents they knew that all the qualifying information contained in their loan applications was false. [*Id.*]. Damiani also was interviewed. [*Id.*]. Damiani had a power of attorney for his father-in-law, Henry Wolf. [*Id.* at 8]. Damiani also told the agents that all the qualifying information contained in Wolf's loan application was false. [*Id.* at 9-10].

The affidavit also provided that during the course of their investigation, the agents learned that a number of e-mails were sent back and forth to Ellison and others regarding the loan transactions and that a number of the emails were sent on Yahoo.com, which stored emails on their central servers. [*Id.* at 10-11, 12]. On November 26, 2007, Ellison received an e-mail from smilleygiggstreasure@yahoo.com purporting to be from Dominique regarding false verification of the down payment monies for the units to be purchased by him. [*Id.* at 12-13]. On November 13, 2007, Ellison received an email purporting to be from Hunter allbig30@yahoo.com containing false information concerning the employment of Hunter. [*Id.* at 12].

20

Stites also swore that he received information from Ellison that the seller, Scott Addison, communicated with Ellison about the status of the review of the borrowers' qualifications and was very concerned about the lender's verification of the tax return information that was submitted on behalf of Dominique, Hunter and Wolf.  [*Id.* at 13-15].  Ellison provided Stites copies of emails that he received from Addison <smaddison0112@yahoo,.com> urging him to find lenders that would not verify the tax return information of Dominique, Hunter and Wolf .  [*Id.* at 12, 13-14].

The supporting affidavit then recounted that on the day of the closing, January 29, 2008, Wilson, one the bogus lien holders on 425 Chappell Road, provided Stites with copies of emails that he had regarding the transactions.  The first email was an email chain.  The first email in the chain was sent on November 30, 2007, from tairon mossy <allbig30@yahoo.com> to gr_investments@yahoo.com. This email contains name, address, DOB, SSAN information for Dominique, Hunter and Wolf. That email requests Verification of Deposits (V.O.D.) for Dominique, Hunter and Wolf and lists the amount for Wolf - $833,000, for Hunter - $380,550, for Dominique $425,000, each and how long it should be purported to have been in each account - all over 90 days.  [*Id.* at 15].  The second email in the chain was dated November 26, 2007, and it was sent from tairon mossy <allbig30@yahoo.com> to

21

waddellwhite@bellsouth.com, and that email forwarded the first email described above plus EIN and bank information for Hunter and Dominique. [*Id.*]. Waddell White was the "broker" who provided the initial identifying information to Ellison about tairon mossy <allbig30@yahoo.com>, and according to the seller his fee would not appear on the closing documents. [*Id.* at 5, 8]. The third email in the chain an email, dated December 26, 2007, was from Waddell White <waddellwhite@bellsouth.com> to the Defendant Ivery <toddivery@yahoo.com>, and forwarded the first two emails. [*Id.* at 15-16]. Along with the emails, White wrote Ivery, "Here is the bank info for your man. Read below." [*Id.* at 16]. The fourth email, dated December 26, 2007, was from Defendant Ivery <toddivery@yahoo.com> to genesis3113@aol.com. [*Id.* at 16]. That forwarded the first three emails in the chain. [*Id.*].

Wilson also provided Stites with an additional email chain. The first email in the chain dated December 26, 2007, from Genesis3113@aol.com to Defendant Ivery <toddivery@yahoo.com> contained the following text: "For these amount [*sic*] see if you can get $1500 per VOD and you keep $1500. Will." [*Id.*]. The "Will" <Genesis3113@aol.com> presumably is Wilson. In the second email in the chain on December 26, 2007, to Genesis3113@aol.com from Defendant Ivery, <toddivery@yahoo.com>, his response was, "Ok let me work on it." [*Id.*]. The third

22

email in the chain on December 26, 2007, from Genesis3113@aol.com to Defendant Ivery, <toddivery@yahoo.com>, asked, "Have you already given them a price?"  [*Id.*]. The final email in the chain is a response dated December 26, 2007, from Defendant Ivery, <toddivery@yahoo.com>, to Genesis3113@aol.com, stating, "Nope."  [*Id.*].  Thereafter, Wilson provided a VOD for Wolf of $902,675.57, dated January 7, 2008, from Conceptual Consultants, which in turn is given to Ellison and to Wells Fargo Bank.  [*Id.* at 7-8].

As for the second search warrant, No. 1:09-MJ-221-AJB, issued by the undersigned, Stites' affidavit in support, [Doc. 138-3], discussed another mortgage fraud scheme involving straw purchaser/borrower, Heather Moomey.  Stites noted that he previously obtained a search warrant for Defendant Ivery's <toddivery@yahoo.com> email account as to another mortgage fraud scheme, and upon execution, had reviewed emails in the account from 2002 through April 24, 2008, and that his review revealed numerous false bank statements attached to the emails. [*Id.* at 3].

Stites then described the mortgage fraud scheme which involved straw borrower Heather Moomey who in late 2008 early 2009, applied for a loan with Quicken Loan to purchase a property in Lawrenceville, Georgia for $265,000.  [*Id.*].  Quicken Loans

23

provided federal law enforcement agents with the sales contract and Moomey's loan application package with supporting documentation. [*Id.*]. The supporting documents included a Bank of America bank statement with a balance of $49,520.26 as of December 24, 2008, a Verification of Employment from Marketing Communications Group with a reported gross monthly income of $9,165 and IRS forms W-2 for 2006 and 2007, reflecting an annual income of $105,139.12 and $108,012.13 respectively. [*Id.*]. Stites noted that Quicken Loans determined from the IRS that Moomey had no reported income for 2006 or 2007. [*Id.* at 4]. Bank of America advised Stites that Moomey had no bank account with them. [*Id.*]. The Georgia Department of Labor advised Stites that Moomey had no reported earnings from Marketing Communications Group. [*Id.*]. The closing documents listed the real estate agent as Andrew Phan, the seller's broker as Sarah Hyldahl, who was to received a $75,000 commission at closing and the buyer's real estate agent as Patrice Hairston, who was also to receive a commission. [*Id.*]. On January 22, 2009, the closing was to take place at an attorney's office in Lawrenceville, Georgia. [*Id.*]. Federal law enforcement agents advised DeKalb County Police of their investigation. [*Id.*]. As a result, the DeKalb County Police went to closing attorney's office, interrupted the closing and arrested Moomey, Hyldahl, and Hairston. [*Id.*].

24

AO 72A
(Rev.8/8
2)

Stites interviewed Moomey and she advised him that the information in the loan application and the supporting documentation was false. [*Id.*]. Stites interviewed Hyldahl and Hairston who advised him that they were business partners and they admitted providing the false loan documentation for Moomey. [*Id.* at 5]. Hyldahl purchased the false Bank of America statements from a black male named "TI" who in a second interview she identified as Defendant Ivery. [*Id.*]. Hyldahl also told Stites that Ivery had provided her with false Bank of America statements for two other loans that had closed with Quicken Loans. [*Id.*]. Hyldahl provided Stites with a copy of an email dated December 13, 2008, from Defendant Ivery, <toddivery@yahoo.com>, to sarah shydahl <shyldahl@yahoo.com> with an attached file containing two false Bank of America statements for Moomey. [*Id.* at 5-6].

>    2.    *Applicable Law*

Search warrants are presumed to be validly issued. *Franks v. Delaware*, 438 U.S. 154, 171 (1978). The burden of establishing that the warrants in this case were defective or executed improperly is upon Defendant. *Id.; United States v. Van Horn*, 789 F.2d 1492, 1500 (11th Cir. 1986); *United States v. Marx*, 635 F.2d 436, 441 (5th Cir. Unit B 1981); *United States v. Osborne*, 630 F.2d 374, 377 (5th Cir. 1980).

25

The task of a judge issuing a search warrant "is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . ., there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  The task of a reviewing court in examining a challenge to a search warrant is different. In determining whether a search warrant is supported by probable cause, a reviewing court is not to conduct a *de novo* determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the judge's decision to issue the warrant. *Massachusetts v. Upton,* 466 U.S. 727, 728 (1984); *United States v. Miller*, 24 F.3d 1357, 1363 (11th Cir. 1994) ("[R]eviewing courts lend substantial deference to an issuing magistrate's probable cause determinations.").  When affidavits are attached to a warrant, courts consider the affiant's statements as well as the search warrant.  *See United States v. Martinelli*, 454 F.3d 1300, 1308 (11th Cir. 2006).  In reviewing the probable cause determination, supporting affidavits should not be interpreted in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations.  *See Gates*, 462 U.S. at 236-37 (citing *United States v. Ventresca*,

26

380 U.S. 102, 109 (1965)); *Miller*, 24 F.3d at 1361.  When it is difficult to determine whether a search warrant affidavit supports probable cause, "the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants."  *Upton*, 466 U.S. at 734 (quoting *Ventresca*, 380 U.S. at 109).

Probable cause to support a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location.  *See United States v. Kapordelis*, 569 F.3d 1291, 1310 (11th Cir. 2009).  "[P]robable cause is a fluid concept--turning on the assessment of probabilities in particular factual contexts[.]"  *Gates*, 462 U.S. at 232.  Thus, the determination of probable cause based on an affidavit "does not lend itself to a prescribed set of rules," but instead uses a "flexible, common-sense standard."  *Gates*, 462 U.S. at 240; *see also United States v. McCraven*, 401 F.3d 693 (6th Cir. 2005) (noting that "while an affidavit must state facts supporting an independent judicial determination that the informant is reliable, those facts need not take any particular form.").

3.     *Analysis*

Reviewed under these standards, the two search warrants challenged by Ivery clearly demonstrate more than sufficient probable cause to believe that his Yahoo email

27

accounts contained evidence of Ivery's participation in mortgage fraud.  As a result of this conclusion, the Court need not discuss whether the *Leon* good faith exception to the exclusionary rule is applicable.  Simply stated, in this case, Ivery has not met his burden to demonstrate that the search warrants were issued without probable cause, nor has he established an entitlement to an evidentiary hearing.

Therefore, the undersigned **RECOMMENDS** that Todd Milton Ivery's Amended Motion to Suppress, [Doc. 133], be **DENIED**.

**IV.**  ***Defendants' Motions for Relief from Prejudicial Joinder/Misjoinder, Severance and Separate Trials, and to Strike Surplusage, [Docs. 48, 54, 59, 132, 144]***

Various Defendants filed motions for relief from prejudicial joinder/misjoinder, severance, and separate trials, or in the alternative motion to dismiss the indictment ("motions to sever"): Damon Saulters, [Doc. 48]; Moses Damiani, [Doc. 54]; Justin Saulters, [Doc. 59]; and Waddell White, [Doc. 144].[7]  The Court also considers Damon Saulters's amended motion for relief from prejudicial joinder/misjoinder, severance and separate trails, and motion to strike surplusage from the indictment.  [Doc. 132].  For

_____

[7]    The Court permitted Damiani, Justin Saulters, and White to adopt the motion to sever by Damon Saulters, [*see* Docs. 52, 58; Dkt. Entry dated 7/21/2011], so the motions to sever in this case are identical.

AO 72A
(Rev.8/8
2)

the reasons discussed below, the undersigned **RECOMMENDS**[8] that the motion to sever by Damon Saulters, [Doc. 48], be **DENIED AS MOOT** and that motions to sever by Damiani, White and Justin Saulters be **DENIED** on the merits, [Docs. 54, 59, 144]. The undersigned additionally **RECOMMENDS** that Damon Saulters' amended motion to sever, [Doc. 132], be **DENIED**.[9]

---

[8]     Title 28 U.S.C. § 636 governs the powers of a magistrate judge and the standard of review to be applied by the district court upon appeal of a magistrate judge's actions.  Section 636(b)(1)(A) and N.D. Ga. CrR 59(2)(b) allow a magistrate judge to hear and determine pretrial matters which are not dispositive of the case.  A motion to sever under FED. R. CRIM. P. 14 is a non-dispositive matter upon which the undersigned may rule by order, as opposed to a report and recommendation.  *See United States v. Bruck*, 152 F.3d 40, 43 (1st Cir. 1998);  *United States v. Potter*, No. 3:09-CR-138, 2010 WL 2776327, *1 (E.D. Tenn. July 14, 2010); *United States v. Bolden*, No. CR08-0001, 2008 WL 4174914, *1 n.1 (N.D. Iowa Mar. 7, 2008); *United States v. Schneider*, No. 07-CR-41, 2007 WL 2407060, *1 (E.D. Wis. Aug.20, 2007) (noting that "[a] magistrate judge has authority to decide nondispositive motions such as motions to sever").  Therefore, the undersigned would ordinarily rule on the motion to sever by order, but the defendants' motions to sever alternatively request dismissal of the indictment.  As a result, the undersigned issues a Report and Recommendation on the motions to sever.

[9]     To the extent that White actually sought to adopt Damon Saulters's amended motion, [*see* Doc. 135 (requesting to adopt Saulters' motion to sever at Document 48 and attaching this motion and its accompanying exhibits to the motion to adopt but also attaching Saulters's amended motion to sever)], he is not entitled to relief for the same reasons that Damon Saulters is not entitled to relief.

29

*A.     Introduction*

On December 14, 2010, a grand jury returned a four-count indictment against the following four defendants: Moses Damiani, Tairon Mossy, Justin Saulters ("J. Saulters"), and Damon Saulters ("D. Saulters").  [Doc. 1].  In Count 1, these defendants were charged with conspiracy to defraud Wells Fargo Bank in violation of 18 U.S.C. § 1349.  In the remaining three counts, the grand jury indicted different combinations of defendants with aiding and abetting and bank fraud in violation of 18 U.S.C. §§ 2, 1344 as follows: (1) Mossy, J. Saulters, and D. Saulters were charged in Counts 2 and 3; and (2) Mossy, Damiani, J. Saulters, and D. Saulters were charged in Count 4.  [*See* Doc. 85].

The original indictment was then superseded on May 17, 2011, with a four-count indictment.  [Doc. 85].  This superseding indictment dropped Mossy[10] as a defendant, but added three new defendants - - Waddell White, Todd Milton Ivery and Willie Wilson.  In Count 1, all defendants were charged with conspiracy to defraud Wells Fargo Bank in violation of 18 U.S.C. § 1349.  The remaining three counts charged various combinations of defendants with aiding and abetting and bank fraud in

_____

[10]     Mossy pleaded guilty to the counts in the original indictment on March 30, 2011.  [*See* Doc. 69].

30

violation of 18 U.S.C. §§ 2, 1344 as follows: (1) White, Ivery, Wilson, J. Saulters, and D. Saulters were charged in Counts 2 and 3; and (2) White, Ivery, Wilson, Damiani, J. Saulters, and D. Saulters where charged in Count 4.  [*See* Doc. 85].

The defendants filed various pretrial motions, including the aforementioned motions to sever, [Docs. 48, 54, 59, 144], and D. Saulters' amended motion for severance and to strike surplusage, [Doc. 132].  The government filed responses to the motions to sever, [Doc. 67], and to D. Saulters's amended motion, [Doc. 139].  The Court considers the merits of these motions below.

B.    *Facts*

1.    *The Actors*

Wilson is the registered agent of Conceptual Consultants, Inc. ("Conceptual"), and he is the organizer of WT&G Property Management LLC ("WT&G").  [Doc. 85 ¶ 2(a), (c)].  White is the Secretary and Ivery the registered agent of I.F.G. and Associates, Inc., ("I.F.G.").  [*Id.* ¶ 2(c)].  J. Saulters, Mossy, and D. Saulters are acquaintances from the New York area who recruited individuals to obtain loans with false qualifying information.  [*Id.* ¶ 2(d)].  Mossy and White are cousins, and Mossy attended college in Atlanta in the 1990s at which time he visited White and Ivery, White's business associate.  [*Id.* ¶ 2(e)].

31

2.      *The Scheme*

White recruited Mossy to find straw borrowers to purchase properties in a development at 425 Chappell Road in Atlanta, Georgia.  Mossy in turn recruited D. Saulters and J. Saulters ("the Saulters brothers") to find straw borrowers, including Shawn Dominique, Milton Hunter, and Moses Damiani.  Damiani then recruited his father-in-law, H.W.[11], as a straw borrower.  [*Id.* ¶ 3].  Ivery recruited Wilson d/b/a Conceptual to provide false verifications of deposits for the straw borrowers.  [*Id.* ¶ 4]. White, Ivery, and Wilson provided materially false qualifying information for the straw borrowers to use with the lenders.  [*Id.* ¶ 5].  The straw borrowers represented to Wells Fargo that they could provide a substantial down payment at the closings.  [*Id.* ¶ 7]. Wilson used WT&G as a fictitious lienholder on the Chappell Property units to support inflated appraisals, sales prices, and to conceal the disbursements of the loan proceeds at the closings.  [*Id.* ¶ 6].

---

[11]      The indictment identifies the father-in-law by initials, but based on the earlier discussion of the Fourth and Fifth amendment issues, it is apparent that H.W. is Henry Wolf.

32

### 3. The Transactions

#### a. Milton W. Hunter, Jr.

J. Saulters approached Hunter to use his credit to purchase real estate. The Saulters brothers and Mossy informed Hunter that he would have to falsify his income information and place of employment to qualify for a loan to purchase property at 16 Emerald Lane in Amityville, New York. Hunter received $10,000 for his role as a straw borrower on the purchase from Mossy and the Saulters brothers. [Doc. 85 ¶ 8(A)(i)]. Hunter served as straw borrower to obtain a $440,000 loan to buy property at 90 Harvest Lane, Levittown, New York 11756, but the lender (a subsidiary of Wells Fargo) rejected Hunter's application for insufficient credit history. [*Id.* ¶ 8(A)(ii)].

Mossy and the Saulters brothers recruited Hunter as a straw borrower to purchase multiple units at the Chappell Property in Atlanta, promising him payment of $50,000 for his role. [*Id.* ¶ 8(A)(iii)]. In November 2007, Hunter submitted a loan application to Wells Fargo with false qualifying information, including assets in false investment accounts (Commonwealth-PMS and A.G. Edwards), false employment at and income with B. Inc.,[12] false 2005 and 2006 W-2s, and a false 2006 income tax return, which was signed by Ivery as a tax preparer. [*Id.* ¶ 8(A)(iv)]. On January 29, 2008, Hunter

_____

[12]    B., Inc., is Babblin, Inc. [*See, e.g.,* Doc. 138-1 at 6].

33

along with Mossy, White, Wilson, and the Saulters brothers traveled to an Atlanta attorney's office to close on the Wells Fargo loans.  [*Id.* ¶ 8(A)(v)].  At the closing, Hunter verified that the loan application was true and correct.  [*Id.* ¶ 8(A)(vi)].

2.   *Shawn Dominique*

The Saulters brothers introduced Dominique to Mossy in November 2007 who sought to use Dominique's credit to purchase multiple units at Chappell Property, at which time Mossy informed Dominique he would have to say he worked at B. Inc. earning a six-figure salary.  [Doc. 85 ¶ 8(B)(i)].  In November 2007, Dominique submitted a loan application to Wells Fargo with false information, including false investment accounts (Commonwealth-PMS and A.G. Edwards accounts), false employment and salary with B. Inc., and fraudulent 2005 and 2006 W-2s and tax statements.  [*Id.* ¶ 8(B)(ii)].  Dominique along with Mossy, White, Wilson, and the Saulters brothers then traveled to an attorney's office in Atlanta for the loan closing on January 29, 2008.  [*Id.* ¶ 8(B)(iii)].

3.   *H.W.*

After Mossy met with Damiani in 2007 to purchase properties, Damiani was unable to qualify for loans due to bad credit, so Damiani convinced his father in-law, H.W., to purchase Chappell Property units.  [Doc. 85 ¶ 8(C)(i)].  A loan application was

34

submitted on H.W.'s behalf to Wells Fargo to purchase multiple Chappell Property units with the following false information: false investment account assets (Conceptual and A.G. Edwards accounts); false income and employment at B. Inc.; and false 2005 and 2006 W-2 statements.  [*Id.* ¶ 8(C)(ii)].  Wilson signed a request for verification in which he falsely attested that H.W. had a $902,675.57 money market account with Conceptual.  [*Id.* ¶ 8(C)(iii)].  On January 29, 2008, Damiani, acting as the power of attorney for H.W., along with Mossy, the Saulters brothers, White and Wilson traveled to an Atlanta attorney's office for the loan closing.  [*Id.* ¶ 8(C)(iv)].  At this closing, Damiani falsely verified that the qualifying information was correct.  [*Id.* ¶ 8(C)(v)].

C.     *Discussion*

1.     *Motions To Sever*

a.     *Contentions of the Parties*

The defendants state that they seek to sever allegations concerning co-defendant Damiani in the allegedly separate conspiracy charged in Count 1 as well as the separate substantive count involving Damiani in Count 4, or they alternatively request that the indictment be dismissed as charging one distinct conspiracy on misjoinder grounds. [Doc. 48 at 1-2, ¶ 10].  The defendants assert that severance is appropriate because the indictment only alleges that Mossy approached Damiani about getting involved in real

35

AO 72A
(Rev.8/8
2)

estate investing without alleging that the Saulters brothers were involved in recruiting Damiani. [Doc. 48 ¶ 3[13]]. The defendants argue that the indictment has charged a "rimless wheel" conspiracy prohibited by *United States v. Kotteakos*, 328 U.S. 750 (1946), because Mossy is the hub of the conspiracy and the Saulters brothers are part of one spoke and Damiani is part of a second spoke with no allegations that the Saulters brothers knew about or were involved in the acts relating to Damiani. [*Id.* ¶ 4]. The defendants also note that Damiani is not named in Counts 2 or 3 of the indictment and there are no allegations that Damiani facilitated the conspiracy to recruit Hunter or Dominique as part of the conspiracy. [*Id.*]. The defendants appear to seek to bolster their argument as to the unrelatedness of Damiani by pointing to discovery showing: (1) H.W. sought to obtain twice the credit as Hunter and Dominique combined, [*id.* ¶ 5]; (2) Hunter's and Dominique's statements demonstrate that Hunter only saw Damiani at the closings but could not name him or describe his role, and Dominique only recognized Damiani from the closing but had not met Damiani and had no knowledge of his involvement, [*id.* ¶ 6]; and (3) Damiani was unable to positively identify any other individual involved except for Mossy when shown a photo

---

[13] Although D. Saulters, J. Saulters, White, and Damiani have all brought motions to sever, the undersigned only cites to D. Saulters' motion to sever because the remaining motions to sever merely adopted this motion.

AO 72A
(Rev.8/8
2)

identification, [*id.*].  The defendants also argue that evidence relating to Damiani's activity concerning H.W. would not be admissible against the other defendants, resulting in a prejudicial spillover effect because the jury would not be able to distinguish acts of the co-defendants and those of Damiani.  [*Id.* ¶¶ 7-8].  Finally, the defendants argue that a separate trial for conspiracy in Count 1 relating to Damiani and Mossy and the substantive Count 4 relating to Damiani would not hinder judicial economy because these are not complex or lengthy counts.  [*Id.* ¶ 9].  Based on these problems, the defendants seek a severance of co-defendant Damiani or dismissal of the indictment for prejudicial joinder.  [*Id.* ¶ 10].

D. Saulters further explains in a separate brief that he seeks to sever allegations relating to co-defendant Damiani in Count 1 and excising Count 4 from the indictment under both FED. R. CRIM. P. 8 and 14.  [Doc. 64 at 2].  He realleges his rimless wheel conspiracy theory by reiterating that there are no allegations that the Saulters brothers knew of or participated in the scheme involving H.W. or that Damiani knew of or participated in the loans involving Hunter and Dominique.  [*Id.* at 6].  D. Saulters argues that the case *United States v. Castro*, 829 F.2d 1038 (11th Cir. 1987), does not control because there is no connection between the first conspiracy with Mossy and the Saulters brothers and the second conspiracy with Damiani.  [*Id.* at 7].  Instead,

37

D. Saulters asserts that this Court should rely on the citation in *United States v. Simon*, 839 F.2d 1461, 1468 (11th Cir. 1988), to a Third Circuit case about the government's need to allege the defendants had knowledge of an overall scheme.  [*Id.* at 7-8].  Additionally, Plaintiff asserts that the misjoinder not only violates Rule 8(b) but also violates Rule 14 because it will compromise the defendants' ability to obtain a fair trial.  [*Id.* at 8].  D. Saulters explains that since the conspiracy case will introduce acts and statements of co-conspirators, these statements relating to Damiani will be inadmissable against the other defendants, thereby resulting in prejudice.  [*Id.* at 8-9].  He also asserts that because the alleged fraud involving Damiani and H.W. was double the fraud relating to Hunter and Dominique, this will prejudice him before the jury.  [*Id.* at 9-10].

The government responds that the defendants are not entitled to severance under either Rule 8 or Rule 14 of the Federal Rules of Criminal Procedure based either solely on the allegations in the indictment or on additional evidence beyond that in the indictment.  [Doc. 67 at 5-15].  First, the government argues that the defendants are properly joined under Rule 8.  [*Id.* at 9-13].  The government asserts that the indictment does not charge an impermissible rimless wheel conspiracy because: (1) Mossy worked with several co-conspirators, including White, on the three sets of properties; (2) the three sets of properties were shopped to lenders as a group; and (3) the property

38

transactions were part of the same series of acts in that (a) they involved the same Chappell Property complex, (b) the loan applications were directed at Wells Fargo, (c) the same false employer was used on the loan applications, (d) the closings were at the same lawyer's office, (e) there were substantial pay outs of loan proceeds, and (f) Mossy, D. Saulters, J. Saulters, Damiani, and White were at the January 28 closings. [*Id.* at 10-12]. The government also notes that the defendants selectively cited to discovery and ignored other evidence including that the H.W. transaction was virtually identical to the other closings and that Damiani was aware of the Hunter and Dominique transactions. [*Id.* at 12]. The government asserts that it is immaterial that Damiani was not charged with the substantive counts involving Hunter and Dominique. [*Id.* at 12-13].

Second, the government argues that severance is not warranted under Rule 14 because none of the defendants will suffer compelling prejudice if tried together. [*Id.* at 14-16]. In making this argument, the government cites to case law describing the two circumstances in which severance is a remedy and asserts that these circumstances are not present in this case. [*Id.* at 14-15]. The government also argues that the defendants made a conclusory showing of prejudice. [*Id.* at 15-16].

AO 72A
(Rev.8/8
2)

The defendants reply by initially arguing that the evidence offered by the government swelled the record but added no new facts to show that joinder was appropriate. [Doc. 72 at 2-4]. First, the defendants assert that while the government showed that Mossy shopped the real estate loans to lenders as a group, this does not show that there is a link between conspiracies or that the straw borrowers had knowledge of the scheme relating to the other straw borrowers. [*Id.* at 2-3]. Second, they assert that the warrant affidavit for the Yahoo emails indicates that Mossy and the Saulters brothers jointly recruited Hunter and Dominique but only Mossy recruited Damiani. [*Id.* at 3-4]. Third, the defendants argue that the government's prior charging of Hunter and Dominique in separate indictments demonstrates that it was willing to endure two trials for the same conspiracy, so the same strategy should apply here. [*Id.* at 4]. Fourth, the defendants assert that the indictment does not plead a single agreement to commit an unlawful act. [*Id.* at 4-5]. Fifth, the defendants contend that the presence of the three straw buyers at the scheduled loan closing is not evidence of an agreement to conspire. [*Id.* at 6].

The defendants next argue that even if joinder of Counts One and Four was proper under Rule 8, these counts should be severed under Rule 14. [*Id.* at 7-9]. First, the defendants argue that the government would not be prejudiced from two separate

40

trials.  [*Id.* at 7].   Second, the defendants reallege their arguments of prejudice, including the spillover of evidence, the confusion resulting from the admission of statements from two conspiracies, and the prejudice from the larger loan amount relating to Damiani.  [*Id.* at 8].  Finally, the defendants reiterate their rimless spoke argument in that the conspiracy charged actually involves two conspiracies, one involving Mossy (the hub) and the Saulters brother, Hunter and Dominique (the first spoke) and the other involving Mossy (the hub) and Damiani (the second, unconnected spoke).  [*Id.* at 9].

> b.     *Applicable Law*

The defendants seek severance under both FED. R. CIV. P. 8 and FED. R. CIV. P. 14.[14]  As a result, the undersigned separately summarizes the law for severance under both Rule 8 and Rule 14 below because "[t]he United States Supreme Court has noted that determinations under Rule 8 and Rule 14 are entirely separate." *United States v. Hernandez*, 921 F.2d 1569, 1579 (11th Cir. 1991) (citing *United States v. Lane*, 474 U.S. 438, 449 n.12 (1986)).

---

[14]     "Severance applies only to counts or parties that are improperly joined." *United States v. Awan*, 966 F.2d 1415, 1426 (11th Cir. 1992).

41

*(i)     Rule 8*

Joinder of defendants under FED. R. EVID. R. 8 is designed to promote judicial economy and efficiency.   *United States v. Weaver*, 905 F.2d 1466, 1476 (11th Cir. 1990).[15]  It "is broadly construed in favor of the initial joinder." *United States v. Davis*, 773 F.2d 1180, 1181 (11th Cir. 1985).  Rule 8(b), as opposed to Rule 8(a),[16] governs the joinder of multiple defendants in a single indictment.  *United States v. Dominguez*, 226 F.3d 1235, 1239 n.4 (11th Cir. 2000); *United States v. Grassi*, 616 F.2d 1295, 1302 (5th Cir. 1978).[17]  The question of whether initial joinder is proper under

---

[15]     FED. R. CRIM. P. 8(b) provides as follows:

The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately.  All defendants need not be charged in each count.

[16]     FED. R. CRIM. P. 8(a) provides as follows:

The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged--whether felonies or misdemeanors or both--are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

[17]     In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

42

Rule 8(b) is to be determined before trial by examination by the trial court of the allegations stated on the face of the indictment. *Weaver*, *id.*  A court also may consider evidence proffered by the government before trial to show that the initial joinder was proper even if the indictment does not explicitly provide a connection between the charges. *Dominguez*, 226 F.3d at 1241.  "A defendant who has been misjoined with others within the meaning of Rule 8(b) is entitled to severance as a matter of law, and the trial court's discretion never enters the picture."  *United States v. McLaurin*, 557 F.2d 1064, 1075 n.14 (5th Cir. 1977); *see also United States v. Bova*, 493 F.2d 33, 35 (5th Cir. 1974) ("[S]everance, where there has been misjoinder, is mandatory and not discretionary with the district courts.") (*abrogated in part by United States v. Lane*, 474 U.S. 438 (1986)); *United States v. Yearty*, No. 1:08cr40-SPM, 2009 WL 1343904, *1 (N.D. Fla. May 8, 2009).  Thus, "[i]f the indictment fails to show and the prosecutor fails to proffer a sufficient basis in the expected evidence to justify joinder, then a severance should be ordered." *Dominguez*, 226 F.3d at 1241.

Rule 8(b) permits the joinder of Defendants in the same indictment "if they are alleged to have participated in the same act or transaction," and the general rule is that defendants indicted together should be tried together, especially in conspiracy cases. *See United States v. Cassano*, 132 F.3d 646, 651 (11th Cir. 1998) (citing *United States*

43

*v. Jacoby*, 955 F.2d 1527, 1542 (11th Cir. 1992); *United States v. Alvarez*, 755 F.2d 830, 857 (11th Cir. 1985)). " '[S]eparate conspiracies with different memberships may still be joined if they are part of the same series of acts or transactions.' " *Weaver*, 905 F.2d at 1476 (quoting *Grassi*, 616 F.2d at 1303). " '[I]n order to establish that the [codefendants] have engaged in the 'same series of acts or transactions' under Rule 8(b) the government must demonstrate that the acts alleged are united by some substantial identity of facts and/or participants.' " *United States v. Arneth*, 294 Fed. Appx. 448, 451 (11th Cir. Sept. 18, 2008) (quoting *United States v. Morales*, 868 F.2d 1562, 1569 (11th Cir. 1989)).

If joinder is appropriate under rule 8(b), a court should then examine whether severance is appropriate under Rule 14, *United States v. Strollar*, 10 F.3d 1574, 1578 (11th Cir. 1994) (citing *Zafiro v. United States*, 506 U.S. 534 (1993)), when the defendant also seeks severance on Rule 14 grounds, *cf. Dominguez*, 226 F.3d at 1238 n.3 (declining to discuss severance under Rule 14 where the defendant did not seek severance under this Rule).

(ii)   *Rule 14*

Rule 14(a) of the Federal Rules of Criminal Procedure allows for severance or "any other relief that justice requires" if joinder "appears to prejudice a defendant or

44

the government." FED. R. CRIM. P. 14(a).  However, "there is a preference in the federal system for joint trials of defendants who are indicted together."  *Zafiro*, 506 U.S. at 537; *see also United States v. Hill*, 643 F.3d 807, 828 (11th Cir. 2011); *United States v. Alvarez*, 755 F.2d 830, 857 (11th Cir. 1985) ("The general rule in [the Eleventh Circuit] is that defendants who are jointly indicted should be tried together, and this rule has been held to be particularly applicable to conspiracy cases."). Rule 14(a) requires "a [district] court to balance the rights of the defendant[ ] and the government to a trial that is free from the prejudice" against the public interest in judicial economy.  *United States v. Novaton*, 271 F.3d 968, 989 (11th Cir. 2001) (quotation omitted) (reviewing the denial of a codefendant severance motion).

A severance under Rule 14 of the Federal Rules of Criminal Procedure should be granted only if the defendant can demonstrate that a joint trial would result in specific and compelling prejudice to the conduct of his defense.[18]  *United States v.*

---

[18]    A court must find compelling prejudice, *i.e.*, grant a severance "if there is a serious risk that a joint trial would [(1)] compromise a specific trial right of one of the defendants, or [(2)] prevent the jury from making a reliable judgment about guilt or innocence."  *United States v. Blankenship*, 382 F.3d 1110, 1122-23 (11th Cir. 2004) (identifying these circumstances as the "only two circumstances in which severance is the only permissible remedy").  As for the first situation where severance is mandatory, the joint trial must lead to the denial of a constitutional right.  *Id.* at 1123.  As for the second category where severance is mandatory, the courts have identified the following situations as preventing a jury from making a reliable judgment: (1) "where compelling

AO 72A
(Rev.8/8
2)

*Marszalkowski*, 669 F.2d 655 (11th Cir. 1982). The test for compelling prejudice is "whether under all the circumstances of a particular case, as a practical matter, it is within the capacity of the jury to follow the [instructions] and accordingly . . . appraise the independent evidence against each defendant's own acts, statements and conduct." *United States v. Kabbaby*, 672 F.2d 857 (11th Cir. 1982). A showing of compelling prejudice may be made by "demonstrating 'that the jury was unable to sift through the evidence and make and individualized determination as to each defendant.' " *Hill*, 643 F.3d at 828. Conclusory allegations do not satisfy the defendant's burden, since courts presume that jurors can compartmentalize evidence by respecting limiting instructions specifying what evidence may be considered against what defendant. *United States v. Blankenship*, 382 F.3d 1110, 1123 (11th Cir. 2004) (citing *United States*

―――――――――――――――

evidence that is not admissible against one or more of the co-defendants is to be introduced against another co-defendant," *e.g.*, gruesome evidence against one defendant, such that the jurors cannot compartmentalize evidence even with a limiting instruction, *id.* at 1123-24; (2) where the "number of defendants and charges with different standards of proof and culpability, along with the massive volume of evidence, makes it nearly impossible for a jury to juggle everything properly and assess the guilt or innocence of each defendant independently," *id.* at 1124; and (3) "where one defendant is being charged with a crime that, while somehow related to the other defendants or their overall criminal scheme, is significantly different from those of the other defendants," *id.* at 1125. Although these three scenarios are "fairly comprehensive," they are not necessarily the only factors that require severance under Rule 14. *Id.* at 1123.

AO 72A
(Rev.8/8
2)

*v. Schlei*, 122 F.3d 944, 984 (11th Cir. 1997)); *see also United States v. Duzac*, 622 F.2d 911, 912 (5th Cir. 1980) (in affirming denial of severance motion asserting grounds that codefendant might testify for defendant, holding that severance not necessary upon defendant's "generalized vague and speculative assertions").

In satisfying this burden, it is not enough for the defendant to show that acquittal would be more likely if he was tried separately, since some degree of bias is inherent in a joint trial. *Alvarez*, 755 F.2d at 857 (citing *United States v. Walker*, 720 F.2d 1527, 1533 (11th Cir. 1983), and *Marszalkowski*, 669 F.2d at 660).  Furthermore, a defendant does not suffer "compelling prejudice" simply because much of the evidence at trial is applicable only to his codefendants.  *Id.* (citing *United States v. Zielie*, 734 F.2d 1447, 1464 (11th Cir. 1984), and *United States v. Berkowitz*, 662 F.2d 1127, 1135 n.8 (5th Cir. Unit B 1981)); *see also Cassano*, 132 F.3d at 651 (same).

Even if a defendant can show some prejudice, a defendant is entitled to severance only if that "prejudice flowing from a joint trial is clearly beyond the curative powers of precautionary instruction."  *United States v. Morrow*, 537 F.2d 120, 126 (5th Cir. 1976); *Puiatti v. McNeil*, 626 F.3d 1283, 1310 (11th Cir. 2010) (recognizing that defendant seeking severance has a "heavy burden" of demonstrating compelling prejudice which occurs only where there is a serious risk that a joint trial (1) "would

47

compromise a specific trial right of one of the defendants," or (2) would "prevent the jury from making a reliable judgment about guilt or innocence.") (citations omitted); *see also   United States v. Walser*, 3 F.3d 380, 385 (11th Cir. 1993) (recognizing that a court errs in denying a severance motion if the denial "result[ed] in compelling prejudice against which [it] could offer no protection").  It is "generally presume[d] that jurors follow their instructions."  *Hill*, 643 F.3d at 829.

Finally, a decision on a motion to sever under Rule 14 involves an exercise of the court's considered discretion.  *Jacoby*, 955 F.2d at 1542.  This discretion means that there may be "a range of possible conclusions [that a] trial judge may reach," but there will be no abuse of discretion as long as the court's choice "does not constitute a clear error of judgment" or the court does not apply the wrong legal standard.  *United States v. Lopez*, --- F.3d ----, ----, 2011 WL 3570298, *11 (11th Cir. Aug. 16, 2011) (quoting *United States v. Frazier*, 387 F.3d 1244, 1259 (11th Cir. 2004)).

### c.    Analysis

The parties' filings raise four issues: (1) whether the motions are moot; (2) whether joinder was proper under Rule 8(b); (3) whether dismissal of the indictment is an appropriate remedy; and (4) whether severance is appropriate under Rule 14.  The undersigned addresses each issue separately.

48

*(i)      Mootness*

The motions to sever were filed prior to the return of the superseding indictment. Since the return of this superseding indictment, D. Saulters has filed an amended motion to sever, [Doc. 132], so the undersigned concludes that his first motion to sever, [Doc. 48], is moot as to him in that the amended motion to sever raises additional arguments stemming from the allegations in the superseding indictment, [*see id.*].

The remaining defendants - -J. Saulters, Damiani, and White - - have not sought to adopt D. Saulters' amended motion to sever, so the undersigned concludes that D. Saulters' amended motion to sever is not a basis for concluding that the initial motions to sever by J. Saulters, Damiani, and White are moot.   However, the undersigned recognizes that the filing of the superseding indictment may be a basis for concluding that these defendants' motions to sever are moot.   *See, e.g.*, *United States v. Rodriguez-Lopez*, 14 Fed. Appx. 854, 857 (9th Cir. July 13, 2001) (concluding that superseding indictment mooted motion to sever where it removed impediment to calling a co-defendant as a witness); *United States v. Gendron*, No. 4:08-cr-244, 2009 WL 5909129, *1 (E.D. Mo. Oct. 28, 2009) (R&R adopted by 2010 WL 682315 (Feb. 23, 2010).   The return of a superseding indictment does not necessarily moot a motion to sever.   *See United States v. Habib*, No. 93-cr-289, 1994 WL 9679 (S.D.N.Y.

49

Jan. 10, 1994) (discussing the merits of a motion to sever despite the return of a superseding indictment).

Here, the undersigned concludes that the superseding indictment does not moot the motions to sever by J. Saulters, Damiani, and White because the superseding indictment still charges Damiani in the conspiracy count and in a separate substantive count, thereby implicating the concerns of relatedness and prejudice raised in these defendants' motions to sever.  As a result, the undersigned addresses the merits of the motions to sever as to J. Saulters, Damiani, and White below.

*(ii)   Rule 8(b)*

The defendants appear to argue that the indictment violates Rule 8(b) because it alleges a rimless wheel conspiracy.  The undersigned is unpersuaded that the superseding indictment alleges multiple conspiracies in Count 1 under this rimless wheel theory.  The Eleventh Circuit has described this theory as follows:

> For a wheel conspiracy to exist those people who form the wheel's spokes must have been aware of each other and must do something in furtherance of some single, illegal enterprise. *Blumenthal v. United States*, 332 U.S. 539, 556–57, . . . (1947).  Otherwise the conspiracy lacks "the rim of the wheel to enclose the spokes." *Kotteakos v. United States*, 328 U.S. 750, 755 . . . (1946).  If there is not some interaction between those conspirators who form the spokes of the wheel as to at least one common illegal object, the "wheel" is incomplete, and two conspiracies rather than one are charged.

50

*United States v. Fernandez*, 892 F.2d 976, 986 (11th Cir. 1989) (quoting *United States v. Levine*, 546 F.2d 658, 663 (5th Cir. 1977)). However, a single conspiracy exists if different spokes on the wheel "engaged in some interaction concerning a common illegal object." *Id.* Stated differently, there is "a single, unified conspiracy as opposed to a series of smaller, uncoordinated conspiracies, [when] the government [ ] show[s] an interdependence among the alleged co-conspirators." *United States v. Chandler*, 388 F.3d 796, 811 (11th Cir. 2004). Such interdependence exists, *inter alia*, where: (1) the combined efforts of the spokes were required to insure the success of the venture; (2) one spoke depended upon, was aided by, or had any interest in the success of the others; (3) each spoke did not act independently and was not an end unto itself; (4) the actions of one spoke facilitated the endeavors of other coconspirators or the venture as a whole; or (5) there is evidence of an overlap of membership between the spokes. *Id.* at 811-12.

The allegations in the superseding indictment demonstrate an interdependence between the co-conspirators. White recruited Mossy to find straw borrowers to obtain loans relating to the Chappell Property development. Mossy in turn recruited Damiani, Dominique and Hunter with the purpose of defrauding Wells Fargo during the purchase of multiple units from the Chappell Property development. Although the defendants

51

argue that the mortgage fraud for each transaction was separate, the allegations of the superseding indictment suggest otherwise. First, the same sort of information was used in the loan applications to defraud Wells Fargo, including false investment accounts, the same false employer (B. Inc.), and false W-2s. Second, the property that the parties sought to purchase were from the same development - - Chappell Property. Third, the co-defendants - - White, Wilson, J. Saulters, and D. Saulters - - were at the closings for H.W. (where Damiani appeared with the power of attorney for H.W.), Wilson, and Dominique. Although the defendants argue that mere association or presence with conspirators is insufficient to establish membership in a conspiracy, this argument ignores the other allegations in the superseding indictment that demonstrate similarities in the fraud transactions and the fact that the fraudulent loans were all being obtained to make purchases of units from the same Chappell Property development. The undersigned concludes that these allegations from the superseding indictment sufficiently connect Damiani in a single conspiracy with the other co-defendants. The undersigned therefore finds that the government has not alleged a rimless wheel conspiracy.[19]

---

[19]   Alternatively, the undersigned notes that the evidence submitted by the government with its response to the motion to sever shows an interdependence because the evidence submitted by the government demonstrates that the allegedly separate

_____

transactions involving Dominique, Hunter, and H.W. were actually related. *See Dominique*, 226 F.3d at 1241 (allowing court to consider evidence proffered by the government to evaluate misjoinder under Rule 8). First, White, identifying himself as a broker, represented that Dominique, Hunter, and H.W. were investors from New York who wanted to purchase 20 units at the Chappell Property. (*See* Stites Aff. ¶ 17 in Doc. 67-1 at 5). White's representations on behalf of the three straw borrowers suggests a link in the scheme to commit mortgage fraud. Second, similar information was used in the loan applications for Dominique, Hunter, and H.W. in that they were employees of Babblin, Inc., had investment accounts with A.G. Edwards and Commonwealth – PMS, and had high incomes with Babblin. (*See id.* ¶¶ 18, 22, 26 in Doc. 67-1 at 5-7). Again, the similarity in the type of fraudulent information used in the loan applications suggests that the loans for H.W., Hunter, and Dominique are not as separate as the defendants allege. Third, the properties to be purchased by Dominique, Hunter, and H.W. all had liens in the amount of $82,000 by WT&G and $30,000 by B.I.G. Holdings LLC that were released on December 28, 2007. (*Id.* ¶ 29 in Doc. 67-1 at 8). The similarity of the liens for the three straw borrowers also links them in one scheme to defraud. Fourth, the appraiser for the properties to be purchased by H.W., Hunter, and Dominique was the same, (*id.* ¶ 34 in Doc. 67-1 at 8), which provides yet another link between the straw borrowers and a common scheme. Fifth, the closings involving Dominique, Hunter, and H.W. were all scheduled for January 29, 2008 at 1:00 p.m. (*Id.* ¶ 35 in Doc. 67-1 at 9). Sixth, the names of the three straw borrowers arose in the same emails. For instance, the seller of the properties - - Scott Michael Addison - - made inquiries to the mortgage broker about the closings involving Hunter, Dominique, and H.W. in the same email. (*See* Stites Aff. ¶ 52(A) in Doc. 67-1 at 32-33). The three straw borrowers' names were found in the same November 20, 2007, email sent from Mossy to White. (*See* Exh. E in Doc. 67-1 at 38). An email about a list of appraisals listed the names of the three straw borrowers. (*See* Exh. G in Doc. 67-1 at 43). Given this cumulative evidence in which the straw borrowers are linked together, the undersigned concludes that the government has proffered sufficient evidence of interdependence for the Court conclude that a single conspiracy exists. As a result, the defendants' theory that the government has alleged a rimless wheel conspiracy is unpersuasive with the evidence linking H.W., Hunter, and Dominique in the same overall fraud scheme.

53

(iii)    *Dismissal*

The defendants' request that the indictment be dismissed because there may be a variance in that the indictment identifies only one conspiracy but actually raises two conspiracies.  [*See* Doc. 48 at 2].  As discussed above, the undersigned concludes that the superseding indictment charges one conspiracy.  However, even if Count 1 of the superseding indictment charged two conspiracies, it does not appear that dismissal of the indictment because of a variance is the proper remedy.  In *United States v. Clarke*, No. CR-07-776, 2008 WL 2228991 (E.D.N.Y. May 28, 2008) (R&R *adopted by* Order dated 6/23/2008), the District Court concluded that dismissal of the indictment was not an appropriate remedy for a potential variance of proof at trial, explaining:

> The *Kotteakos* decision provides no support, however, for the notion that the potential for a variance of proof at trial serves as grounds for dismissing an indictment before trial.  Rather, the decision rested on an examination of the proof actually offered at the trial, and was essentially a finding that the government failed to meet its burden of proving the charge in the indictment.  Such a decision can only be made after the presentation of the government's case at trial, and thus does not lend itself to a pretrial motion to dismiss an indictment.

*Id.* at *9.  The Tenth Circuit has also indicated that dismissal of the indictment is not the appropriate remedy where multiple conspiracies emerge despite the indictment only describing one conspiracy.  *United States v. Bowline*, 593 F.2d 944, 947 (10th Cir.

54

Case 1:10-cr-00519-AT-AJB   Document 155   Filed 09/23/11   Page 57 of 68

1979); *see also United States v. Bin Laden*, 91 F. Supp. 2d 600, 612 (S.D.N.Y. 2000) (stating belief that dismissal of the indictment, as opposed to a severance, is not the appropriate remedy where multiple conspiracies).[20]

Also, to the extent that the defendants seek dismissal because of misjoinder, it does not appear that dismissal of the indictment is an appropriate remedy on misjoinder grounds. *See United States v. Ervin*, No. 1:11-cr-007, 2011 WL 2551192, *4 (M.D. Ala. June 6, 2011) (R&R *adopted by* 2011 WL 2551186 (June 27, 2011) ("[A]ny improper joinder of Defendants does not warrant the extreme remedy of dismissal of the Superseding Indictment."); *cf. United States v. Goodman*, 285 F.2d 378, 379 (5th Cir. 1960) (finding that the proper relief for a misjoinder of offenses under

---

[20]     The undersigned recognizes that the Eleventh Circuit in *United States v. Chandler* stated that "the Fourth Circuit applied *Kotteakos* to affirm the dismissal of an indictment charging a similar rimless wheel conspiracy." 388 F.3d at 808. The Eleventh Circuit's decision contains a typographical error because the decision it cited in making this statement - - *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203 (4th Cir. 2002) - - was actually a civil action in which the Fourth Circuit affirmed the dismissal of a civil complaint, not an indictment. *See Dickson*, 309 F.3d at 198 (noting that plaintiffs appealed "the district court's dismissal under Federal Rule of Civil Procedure 12(b)(6)" and affirming the dismissal). As a result, the undersigned concludes that *Chandler* does not support the request to dismiss the indictment for allegedly bringing multiple conspiracies in one count.

55

(Rev.8/8
2)

Rule 8(a)[21] was not dismissal of the entire indictment but severance of the offenses for separate trials).

Finally, although not explicitly asserted by the defendants, they may be arguing that Count 1 of the indictment should be dismissed as duplicitious. "A count in an indictment is duplicitous if it charges two or more separate and distinct offenses." *United States v. Seher*, 562 F.3d 1344, 1360 (11th Cir. 2009) (quoting *United States v. Schlei*, 122 F.3d 944, 977 (11th Cir. 1997)). Dismissal of a duplicitious count in an indictment may be appropriate remedy. *See United States v. Haimowitz*, 706 F.2d 1549, 1560 (11th Cir. 1983) (addressing whether district court erred in refusing to dismiss count one where defendant argued it alleged multiple conspiracies under *Kotteakos*).[22] As discussed above, Count 1 charges one conspiracy, not multiple conspiracies, so the undersigned concludes that Count 1 is not duplicitous. As a result, dismissal of Count 1 on duplicity grounds is inappropriate.

_____

[21]     In certain cases, the Eleventh Circuit has noted that "the governing principles" for Rule 8(a) and Rule 8(b) "are the same." *Dominguez*, 226 F.3d at 1239 n.4.

[22]     The former Fifth Circuit has indicated, however, that an "entire count should not be dismissed [as duplicitous] when a less drastic ruling will suffice," such as requiring the government to elect on which charge it would proceed. *United States v. Goodman*, 285 F.2d 378, 380 (5th Cir. 1960).

56

Accordingly, the undersigned concludes that the indictment should not be dismissed.

### (iv)   Rule 14

The defendants alternatively argue that severance is appropriate under Rule 14 because they will suffer compelling prejudice in that: (1) the admission of evidence relating to Damiani would cause prejudicial spillover for the other defendants as juror confusion would arise; and (2) the evidence relating to Damiani and H.W. is prejudicial in that they were seeking to obtain double the amount in loans than were Hunter and Dominique.  The undersigned is unpersuaded.

The undersigned concludes that the defendants' arguments relating to severance do not demonstrate that any of the situations identified by the Eleventh Circuit in *United States v. Chandler* as require severance under Rule 14.  *See* footnote 18 *supra*. The defendants have not argued that joinder will lead to the denial of a constitutional right.  *Chandler*, 382 F.3d at 1123.  They also have not argued that there are a large number of defendants, a number of standards of proof, or a massive volume of evidence.  *Id.* at 1124.  Instead, the two conspiracies that the defendants allege to be charged are characterized as straightforward by the defendants.  [*See* Doc. 48 ¶ 9; Doc. 72 at 7].  They also have not argued that Damiani has been charged with a crime

57

that is significantly different from those charged against his co-defendants. *See id.* at 1125. Even if they had raised this argument, the superseding indictment demonstrates that the charges are related, and the evidence submitted by the government removes any question that the alleged scheme by the defendants was not part of one conspiracy. *See* footnote 19 *supra*.

The defendants do argue that evidence against Damiani will not be admissible against his co-defendants, but the Eleventh Circuit has indicated that such evidence must be "compelling" such that the jurors would not be able to compartmentalize the evidence even with a limiting instruction. *Chandler*, 382 F.3d at 1123-24; *see also Hill*, 643 F.3d at 828. The defendants have not explained how any evidence relating solely to Damiani would be sufficiently prejudicial to mandate severance. The Court does not find the evidence that Damiani through H.W. sought loans doubled to those sought by Hunter and Dominique to have any prejudicial spillover effect for two reasons. First, this evidence is relevant to the single conspiracy charged by the government. Second, even if the evidence were only relevant to Damiani, it does not mandate severance, especially given the Eleventh Circuit's recent decision in *United States v. Lopez* where two co-defendants were tried along with two co-conspirators who were also being prosecuted for murdering a fellow drug dealer, his wife, and their two young children.

58

*Lopez*, --- F.3d at ----, 2011 WL 3570298 at *14. Despite the jury being subjected to autopsy reports, graphic photos of the victims, and testimony about the murders, the Eleventh Circuit held that there was no abuse of discretion in trying the defendants together where: (1) the district court instructed the jury to compartmentalize the evidence through a number of jury instructions throughout the trial, *id.* at *14-15; and (2) the evidence presented at trial showed compelling evidence of the co-defendants' guilt, *id.* at *15-16. The undersigned recognizes that the procedural posture between this case (pre-trial motions stage) and the *Lopez* case (post-trial appeal) are different, but if a court's curative instructions to a jury can alleviate prejudicial evidence of a murder that was relevant to only two co-defendants, then the undersigned fails to see why curative instructions to the jury that Damiani's conduct should be considered separately from that of his co-defendants would not alleviate any prejudice in this case.

The undersigned also concludes that the defendants' other arguments do not demonstrate that a severance is required. That the government will not be prejudiced by having two separate trials, [Doc. 72 at 7], seems to be irrelevant because the standard for severance is whether the defendant or the government would suffer prejudice by a joint trial. *See* FED. R. CRIM. P. 14(a). Also, there will be no jury confusion about the government charging two separate conspiracies because as

59

discussed above, the government only charged one conspiracy. Finally, because the undersigned finds no rimless wheel conspiracy was alleged, this does not provide any basis for severance under Rule 14.[23]

Accordingly, the undersigned concludes that Counts 1 and 4 relating to Damiani should not be severed under Rule 14(a).

Based on the reasoning above, the undersigned **RECOMMENDS** that the motions to sever, [Docs. 48, 54, 59, 144], be **DENIED**.

### 2. *Amended Motion to Sever and Motion to Strike Surplusage*

#### a. *Contentions of the Parties*

D. Saulters argues that Count 1 of the superseding indictment alleges a classic rimless wheel conspiracy by raising four separate conspiracies as follows: (1) Mossy, White, Ivery, Wilson, and the Saulters brothers sought to defraud Wells Fargo by submitting false loan applications by Hunter and Dominique; (2) Mossy, White, Ivery,

---

[23]     Additionally, even if the evidence at trial ultimately demonstrates that two conspiracies existed, the district court can provide jury instructions for multiple conspiracies to account for this variance. *See United States v. Moore*, 525 F.3d 1033, 1044 (11th Cir. 2008). It is also not error to join separate conspiracies "if they are part of the same series of acts or transactions," *Hill*, 643 F.3d at 829 (quoting *Weaver*, 905 F.2d at 1476), and the transactions in this case are unquestionably related given that the straw borrowers were being used to defraud Wells Fargo in obtaining loans for units at the same Chappell Property development.

AO 72A
(Rev.8/8
2)

Wilson, and Damiani sought to defraud Wells Fargo by submitting a false loan application of H.W.; (3) Mossy and the Saulters brothers were involved in mortgage fraud by using Hunter as a straw borrower to obtain property in Amityville, New York; and (4) Mossy and the Saulters brothers were involved in mortgage fraud in 2007 using Hunter as a straw borrower to obtain property in Levittown, New York. [Doc. 132-1 at 2-3]. Given these four alleged conspiracies, D. Saulters seeks to have the allegations relating to Damiani in Count 1 severed as well as the substantive Count 4 relating to Damiani severed. [*Id.* at 4, 12]. He alternatively seeks to have the indictment dismissed for failure to charge one distinct conspiracy. [Doc. 132 at 2]. D. Saulters argues that severance is appropriate because it alleges a rimless wheel conspiracy, thereby entitling him to a separate trial from Damiani pursuant to Rule 8(b). [Doc. 132-1 at 4-5, 8]. Specifically, D. Saulters asserts that there are no allegations that he knew of or participated in the scheme involving the H.W. loans and Damiani or that Damiani knew of or participated in the loans involving Hunter and Dominique. [*Id.* at 8]. D. Saulters asserts that the indictment fails to allege a connection between the conspiracy involving him and the one involving Damiani. [*Id.* at 8-9]. D. Saulters also seeks severance under Rule 14 on the basis of prejudicial spillover from the evidence relating to Damiani. [*Id.* at 10-11].

AO 72A
(Rev.8/8
2)

Besides severance under Rules 8 or 14, D. Saulters also seeks to have the separate conspiracies alleged in Count 1 relating to the New York fraud schemes struck as surplusage under FED. R. CIV. P. 7(d), but he asks that the Court delay ruling on the request to strike the surplusage until the District Judge hears evidence at trial relating to the relevance of this surplusage language.  [*Id.* at 12-13].

The government responds that the superseding indictment does not constitute a rimless wheel conspiracy because the defendants worked closely with other conspirators on the three sets of properties that the straw borrowers were to purchase. [Doc. 139 at 10-11].  The government also argues that the straw borrower transactions were part of the same series of acts or transactions in that the straw borrowers were seeking to buy properties from the Chappell Property complex, were seeking to defraud Wells Fargo, used similar fraudulent information in the loan applications, and sought to close the loan at the same attorney's office at the same time.  [*Id.* at 11-12].  The government further rebuts D. Saulters's arguments by asserting that: (1) although H.W. sought twice the loan proceeds, the loans sought were virtually identical; and (2) there was substantial identity of facts and participants.  [*Id.* at 12-14].  The government next asserts that D. Saulters will not suffer compelling prejudice from a joint trial of all defendants because the counts in the indictment are properly joined and D. Saulters has

62

only provided conclusory allegations of prejudice.  [*Id.* at 16].  Finally, the government argues that it is not appropriate to strike language from the superseding indictment because the language relating to Hunter's role as a straw borrower for the New York property is pertinent to the conspiracy in that they establish the prior relationship between Mossy, the Saulters brothers, and Hunter and establish the Saulters brothers' motive to join the conspiracy to purchase.  [*Id.* at 18].

### b.    Analysis

The undersigned concludes that D. Saulters is not entitled to have the indictment dismissed or the charges relating to Damiani severed for the reasons outlined above in discussion of Defendants' motions to sever.  As for D. Saulters's motion to strike surplusage, the undersigned concludes that the motion should be denied for the reasons below.

A "court may strike surplusage from the indictment" upon a defendant's motion to strike.  FED. R. CRIM. P. 7(d); *United States v. Brye*, 318 Fed. Appx. 878, 880 (11th Cir. Mar. 13, 2009).  "The inclusion of clearly unnecessary language in an indictment that could serve only to inflame the jury, confuse the issues, and blur the elements necessary for conviction under the separate counts involved surely can be prejudicial."  *United States v. Bullock*, 451 F.2d 884, 888 (5th Cir. 1971).  As a result,

63

surplusage should be stricken if "it is clear that the allegations are not relevant to the charge and are inflammatory and prejudicial." *United States v. Awan*, 966 F.2d 1415, 1426 (11th Cir. 1992). Since this is an exacting standard, a court may reserve ruling on the motion to strike surplusage until it "has heard evidence that will establish the relevance of the allegedly surplusage language." *Id.*

The undersigned concludes that D. Saulters has not demonstrated that the allegations relating to the use of Hunter as a straw borrower in New York was irrelevant and inflammatory and prejudicial. Instead of trying to make this showing, D. Saulters instead requests that this request be deferred until trial. [Doc. 132-1 at 13]. Although the District Court is authorized to delay ruling on the motion, *Awan, id.*, the defendant must attempt to show that the surplusage would be prejudicial. Here, D. Saulters merely states that the New York loan schemes are unrelated to the Atlanta conspiracy and substantive charges in the indictment and do not involve White, Ivery, or Wilson. [Doc. 132-1 at 12-13]. This argument implicates the irrelevance requirement for striking surplusage and accordingly does not address the requirements that the information be inflammatory and prejudicial. By failing to proffer arguments as to these factors, the undersigned concludes that the District Court need not delay ruling on the motion until trial.

64

Even if D. Saulters had further elaborated why the information in the indictment was surplusage that had to be stricken, the undersigned would still conclude that the motion should be denied.  As the government argues, this information shows a prior relationship with the Saulters brothers and Hunter in New York mortgage fraud schemes, which in turn suggests that the Saulters brothers intended to use Hunter as a straw borrower in the Atlanta scheme to defraud Wells Fargo.  [*See* Doc. 139 at 18]. Also, the New York fraud scheme provides background about Mossy and Saulters brothers' use of Hunter as a straw borrower.  *See Swanson v. United States*, No. 1:08-cv-1180, 2011 WL 2150139, *6 (S.D. Ind. May 25, 2011) (surplusage that provided context and background would not have warranted a motion to strike).  As a result, the undersigned concludes that this information should not be stricken as surplusage.

Accordingly, the undersigned **RECOMMENDS** that D. Saulters' amended motion to sever and motion to strike surplusage, [Doc. 132], be **DENIED**.

## V.   *Conclusion*

For the reasons discussed above, the undersigned **RECOMMENDS** that: (1) Moses Damiani's Motion to Suppress Statements, [Doc. 51], be **DENIED**; (2) Willie Wilson's Preliminary Motion for Disclosure of Items or Statements Arguably Subject to Suppression and Motion to Suppress, [Doc. 120], be **DENIED**;

65

(3) Todd Milton Ivery's Amended Motion to Suppress, [Doc. 133];

(4) Damon Saulters' motion to sever, [Doc. 48], be **DENIED AS MOOT**;

(5) Moses Damiani's, Waddell White's and Justin Saulters' motions to sever, [Docs. 54, 59, 144], be **DENIED**; and (6) D. Saulters' amended motion to sever and motion to strike surplusage, [Doc. 132], be **DENIED**.

The undersigned has now ruled upon all pretrial motions, and has not been advised of any problems preventing the scheduling of trial. Therefore, this case is **CERTIFIED READY FOR TRIAL**.

**IT IS SO CERTIFIED AND RECOMMENDED**, this the 23rd day of September, 2011.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

66